# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**SHAWN HIGGINS**                                   **CIVIL ACTION**

**versus**                                          **NO. 09-2330**

**BURL CAIN, WARDEN**                               **SECTION: "I" (3)**

## SUPPLEMENTAL REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **CONDITIONALLY GRANTED IN PART**.

### I.  Procedural History

Petitioner, Shawn Higgins, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On February 26, 2000, he was convicted of second degree murder in violation of Louisiana law.[1]  On March 3, 2000, he was sentenced to a term of life imprisonment

---

[1] State Rec., Vol. X of XII, transcript of February 26, 2000, p. 192; State Rec., Vol. I of XII, minute entry dated February 26, 2000; State Rec., Vol. I of XII, jury verdict form.

without benefit of parole, probation, or suspension of sentence.[2]  On October 17, 2001, the Louisiana

Fifth Circuit Court of Appeal affirmed that conviction and sentence.[3]  Petitioner's related writ

applications were then denied by the Louisiana Supreme Court on November 1, 2002,[4] and by the

United States Supreme Court on May 19, 2003.[5]

On May 12, 2004, petitioner filed with the state district court a *pro se* application for

post-conviction relief.[6]  That application was later supplemented by counsel on October 4, 2006.[7]

On September 12, 2007, the state district court set one of petitioner's claims for an evidentiary

hearing and denied the remaining claims.[8]  Petitioner's related writ applications challenging that

order were denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[9] and by the

Louisiana Supreme Court on January 30, 2009.[10]

---

[2] State Rec., Vol. X of XII, transcript of March 3, 2000; State Rec., Vol. I of XII, minute entry dated March 3, 2000.

[3] State v. Higgins, 800 So.2d 918 (La. App. 5th Cir. 2001) (No. 01-KA-368); State Rec., Vol. I of XII.

[4] State v. Higgins, 828 So.2d 565 (La. 2002) (No. 2001-KO-3267); State Rec., Vol. I of XII.

[5] Higgins v. Louisiana, 538 U.S. 1038 (2003) (No. 02-9516); State Rec., Vol. I of XII.

[6] State Rec., Vol. I of XII.

[7] State Rec., Vol. II of XII.

[8] State Rec., Vol. III of XII, Order dated September 12, 2007.

[9] Higgins v. Cain, No. 07-KH-811 (La. App. 5th Cir. Dec. 7, 2007) (unpublished); State Rec., Vol. III of XII.

[10] State *ex rel.* Higgins v. Cain, 999 So.2d 741 (La. 2009) (No. 2008-KP-0052); State Rec., Vol. XI of XII.

In the interim, after holding evidentiary hearings, the state district court denied petitioner's remaining post-conviction claim on December 13, 2007.[11]  The Louisiana Fifth Circuit Court of Appeal then denied petitioner's related writ application on February 25, 2008,[12] and he did not seek review of that judgment by the Louisiana Supreme Court.

Petitioner, through counsel, filed the instant *habeas corpus* petition on February 4, 2009.[13]  The undersigned thereafter issued a report recommending that the application be dismissed without prejudice as a mixed petition asserting both exhausted and unexhausted claims.[14]  The United States District Judge adopted that recommendation and dismissed the petition.[15]  Petitioner then moved for leave to dismiss his unexhausted claims and proceed on only the exhausted ones.[16]  The District Judge granted that motion and referred the matter back to the undersigned for a Report and Recommendation on the exhausted claims.[17]

Accordingly, only the following claims are currently before the Court for review:

---

[11] State Rec., Vol. III of XII, minute entry dated December 13, 2007.

[12] Higgins v. Cain, No. 07-KH-1040 (La. App. 5th Cir. Feb. 25, 2008) (unpublished); State Rec., Vol. III of XII.

[13] Rec. Doc. 1.

[14] Rec. Doc. 19; Higgins v. Cain, Civ. Action No. 09-2330, 2010 WL 1855870 (E.D. La. Feb. 8, 2010).

[15] Rec. Docs. 23 and 24; Higgins v. Cain, Civ. Action No. 09-2330, 2010 WL 1935866 (E.D. La. May 6, 2010).

[16] Rec. Doc. 27.

[17] Rec. Doc. 28 and 29.

1.      Petitioner received ineffective assistance of counsel both at trial and on appeal under the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984);[18] and

2.      The jury engaged in prejudicial conduct by prematurely deliberating.[19]

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28

---

[18] This was claims Number 2 and 4 in the original petition.

[19] This was claim Number 5 in the original petition.

U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses

[of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals

has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases.  A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme
> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets,

and footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways.  First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Courts cases but unreasonably applies it to the
> facts of the particular state prisoner's case.  Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one."   <u>Bell</u>, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

### III.  Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> At approximately 10:30 p.m. on October 25, 1998, Carl Jackson was shot and killed in the stairwell of an apartment complex in the Golden Heights subdivision in Marrero.  According to the physician who performed the autopsy, Jackson sustained fourteen gunshot wounds, at least three of which were fatal.
>
> At the hearing on the motion to suppress, Ben Rocque, Carl Jackson's cousin, testified that he and Jackson visited a friend, Shawn Boudreaux, on the evening of the shooting.  After the visit Rocque and Jackson descended the stairs from Boudreaux's apartment. When Jackson reached the bottom of the stairs, Rocque saw a man he later identified as Higgins jump out behind Jackson and point a gun at Jackson.  After Rocque yelled a warning to Jackson, Higgins turned and pointed the gun at Rocque. Rocque began running up the stairs, but he tripped and fell.  Rocque said he looked around, but could not see Higgins or Jackson.  He then ran down the stairs and peeked around the corner.  Rocque saw Higgins pointing the gun at

Jackson, who was saying "I ain't got nothing. I don't have nothing." Rocque said that he could not see the defendant's face at that time, but knew it was the same person he had seen earlier because the man was wearing the same clothing as he had seen before.

Rocque ran back to the apartment to tell Boudreaux that Jackson was getting robbed, and to obtain a weapon. However, while inside the apartment, Rocque heard gunfire. When he looked out of the window, Rocque saw Jackson lying on the ground. By the time Rocque returned downstairs, Jackson was dead.

Rocque admitted that he initially told the officers he did not know what had happened. Later that night he told the police that he saw the assailant, but did not see the actual shooting. Rocque said he described the person he had seen to the police, and a sketch was drawn. The next morning, Deputy Michael Tucker complied a six-person photograph lineup containing the defendant's photograph, and Rocque identified the defendant as the assailant. Because Rocque was not absolutely certain about his identification, Deputy Tucker showed Rocque another six-person photographic lineup containing a more recent photograph of the defendant. When Rocque viewed the second lineup, he positively identified the defendant.[20]

This Court notes that petitioner's former girlfriend, Danielle Williams, also testified at trial. She testified that she gave a statement saying that petitioner had confessed to her that he killed Carl Jackson; however, she further testified that the statement was untrue and was solely the product of police coercion.[21]

The Court further notes that Melvin Jenkins was also called to testify at trial but initially invoked his right against self-incrimination. However, after being granted immunity, he

---

[20] State v. Higgins, 800 So.2d 918, 920 (La. App. 5th Cir. 2001) (No. 01-KA-368); State Rec., Vol. I of XII.

[21] See, e.g., State Rec., Vol. VII of XII, transcript of February 24, 2000, pp. 81-83 and 87-88.

testified that, on the night of the murder, he saw petitioner changing clothes in a parking lot near the apartment complex.  He further testified that petitioner admitting to killing Carl Jackson.[22]

## IV.  Petitioner's Claims

### A.  Ineffective Assistance of Counsel

Petitioner claims that he received ineffective assistance of counsel both at trial and on appeal.  In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Id. at 697.

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

---

[22] See, e.g., State Rec., Vol. VIII of XII, transcript of February 25, 2000, pp. 81 and 105-09.

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to *trial* counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  However, in order to prove prejudice with respect to a claim that *appellate* counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation.  Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

A petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim.  A petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.  Strickland, 466 U.S. at 697.

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

With respect to petitioner's claim that his trial counsel was ineffective, the state district court held:

> The petitioner ... contends that his retained trial counsel, Martin Regan, was ineffective in a number of important respects. He claims that counsel should have requested funds for an investigator to interview witnesses and for an expert to view the crime scene. The petitioner also complains that defense counsel did not consult with mental health experts or seek independent DNA testing.
>
> Under the standard set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and State v. Washington, 491 So.2d 1337 (La. 1986), a conviction must be reversed if the defendant proves (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. State v. Legrand, 2002-1462 (La. 12/3/03), 864 So.2d 89.
>
> To be successful in arguing ineffective assistance of counsel, a petitioner must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment. A petitioner must also prove actual prejudice to the point that the results of the trial cannot be trusted. Both prongs of the Strickland test must be established before relief will be granted.
>
> There is a strong presumption that counsel's performance is within the wide range of effective representation. Effective counsel does not mean errorless counsel and the reviewing court does not judge counsel's performance based on hindsight, but rather determines whether counsel was reasonably likely to render effective assistance. State v. Soler, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075.

In addition to the high bar established by <u>Strickland</u>, the burden of proof, as in all applications for post-conviction relief, is on the petitioner.  LSA-C.Cr.P. art. 930.2.  This principle is counterbalanced by the strong presumption that counsel's performance is within the wide range of effective representation.

A review of the trial record reveals that defense counsel was a skilled and effective advocate and that the petitioner was not prejudiced by counsel's actions.  It was the strength of the evidence, rather than defense counsel's performance, that led to the petitioner's conviction and sentence.

The petitioner also complains that his retained attorney, Martin Regan, rendered ineffective assistance because of a lack of funds.  The petitioner states that he was unable to retain an investigator and independent experts in crime scene analysis, mental health, or DNA.  He argues that counsel should have petitioned the court for state funds to hire such experts.

In other claimed instances of ineffective assistance of counsel, the petitioner complains that his attorney did not request a competency hearing, did not properly advise him, did not litigate pretrial issues, did not obtain adequate jury instructions, and did not move for a new trial.  The state responds to these complaints by noting that all of these accusations are conclusory and therefore not in compliance with LSA-C.Cr.P. art. 926(B)(3) and (E).

These codal articles provide that a petition for post-conviction relief must contain a statement of the grounds upon which relief is sought and it must specify with reasonable particularity the basis for such relief.  LSA-C.Cr.P. art. 926(B)(3).  Upon review of the record, this Court determines that the "other instances" of ineffective assistance fail to specify the factual basis of relief.  The petitioner has not met his burden of proof on these claims and further discussion is not warranted.  Relief on this claim will be denied.[23]

---

[23] State Rec., Vol. III of XII, Order dated September 12, 2007, pp. 4-5.

Without additional reasons assigned, petitioner's related writ applications challenging that order were denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[24] and by the Louisiana Supreme Court on January 30, 2009.[25]

As noted, petitioner first argues that counsel was ineffective for failing to conduct an adequate investigation himself or to apply for state funds to hire a private investigator to conduct such an investigation.  It is clear that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.  It is also clear that, at least in some circumstances, Louisiana provides state funds for indigent defendants to hire private investigators.  See State v. Madison, 345 So.2d 485, 490 (La. 1977).[26]

---

[24] Higgins v. Cain, No. 07-KH-811 (La. App. 5th Cir. Dec. 12, 2007) (unpublished); State Rec., Vol. III of XII.

[25] State ex rel. Higgins v. Cain, 999 So.2d 741 (La. 2009) (No. 2008-KP-0052); State Rec., Vol. XI of XII.

[26] The Louisiana Supreme Court has held that "[p]art of the state's obligation in providing effective assistance of counsel to an indigent defendant is satisfied by its furnishing of the indigent's defense counsel with all of the 'basic tools of an adequate defense,' at no cost to the indigent defendant." State v. Touchet, 642 So.2d 1213, 1215 (La. 1994) (quoting Britt v. North Carolina, 404 U.S. 226, 227 (1971)).  The Louisiana Supreme Court has further held:

> The right to a private investigator may in many cases be an adjunct to the right to counsel:  furnishing counsel to the indigent defendant is not enough if counsel cannot secure information on which to construct a defense.  It is a fundamental principle that the kind of trial a man gets cannot be made to depend on the amount of money he has.  Therefore when an indigent defendant shows that his attorney is unable to obtain existing evidence crucial to the defense, the means to obtain it should be provided for him, and if the indigent defender system cannot defray the expense, the State ought to supply

With respect to such ineffective assistance claims, however, the mere fact that counsel's pretrial investigation failed to exhaust every possible avenue for exploration is not determinative.  See Lovett v. Florida, 627 F.2d 706, 708 (5th Cir. 1980) ("[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers.").   Rather, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Strickland, 466 U.S. at 691.

Moreover, a petitioner who presents nothing more than a conclusory allegation that the investigation was insufficient is not entitled to relief.  Rather, to prevail on a such claim, the petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed.  See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).  Further, when a petitioner claims that an investigator should have been hired, federal *habeas* relief is not warranted unless it is shown that the failure to retain an investigator in fact "substantially prejudiced [the petitioner's] trial."  Jackson v. Day, No. 96-30563, 1997 WL 450202, at *2 (5th Cir. July 16, 1997).  If the evidence of the petitioner's guilt is overwhelming, that showing cannot be made.  Id. at *3.

---

the funds.

Madison, 345 So.2d at 490 (citations omitted).  However, the Louisiana Supreme Court has continued to stress that "[t]he burden is on the defendant to prove he is unable to obtain existing evidence crucial to his defense."  State v. Allen, 682 So.2d 713, 721 (La. 1996).

In support of these claims, petitioner argues that the defense team should have interviewed Melvin Jenkins.  In an affidavit executed on October 1, 2002, Jenkins stated that the police coerced him into giving a false statement implicating petitioner and that he was further coerced into testifying in accordance with that statement at trial.[27]  In that affidavit, Jenkins stated:

13.     Around February of 2000, a policeman and a DA came to my house.  They told me that they needed me to come to the DA's office on the following Monday to talk about my testimony at the Shawn Higgins trial.  I didn't want to go but I went anyway because I was afraid of what they might do to me.  I arrived with my mother who left right after.  At the courthouse, they showed me the statements I made to the police back in October, 1998.  I went over the statements with them and told them I wouldn't testify to those statements since I only gave those statements because the police told me to say those things or they would take me to jail.

14.     When I told them I would not testify to what was in my statement because what I said in the second and third statements were false, they took me to jail and held me on a material witness warrant until the trial.

15.     When I was called to testify at trial, I plead the Fifth on the witness stand.  *I thought they might charge me with a crime at the trial.*  Also, I did not want to testify to what the police told me to say and which I knew was false.

16.     Despite pleading the Fifth, I was still forced to testify.  Even though I knew it was false, I testified to what was in the second and third statements.  *The only reason I testified the way I did is because I feared that I might be charged with something if I did not testify.*

17.     At trial, I testified that I saw Shawn Higgins changing clothes in the parking lot of the Ridgefield apartment complex.  This

---

[27] A copy of that affidavit is attached to petitioner's federal application at Rec. Doc. 1-1, pp. 22-23.

is not true.  At the trial I also testified that Shawn Higgins told me that he killed Carl Jackson as he was coming down the stairs.  This was also untrue.  *I only testified to these things since I was afraid that I might be charged with something.  I thought that if I testified differently, the DA would take away my immunity and charge me with killing Carl Jackson.*

18.     *I did not give the above statement previously because I feared prosecution for the first degree murder of Donald Price.*[28]

In a subsequent undated statement, Jenkins stated that he "would have told Shawn Higgins attorney Martin Regan all of the information in the October 1 statement if he had tried to interview me before Shawn's trial in 2000.  Martin Regan never came to see me before Shawn Higgins trial in 2000."[29]

Even ignoring the obvious credibility issues posed by an individual who alleges that he gave at least two false statements to law enforcement officers and committed perjury on the stand, the second statement simply makes no logical sense in light of the prior affidavit.  As noted, in that affidavit, Jenkins stated *repeatedly* that he feared that he would be charged with this and another murder unless he implicated and testified against petitioner.  If Jenkins was willing to commit perjury in order to avoid being charged with two murders, his assertion that he would have freely and voluntarily exposed himself to that very fate in an interview with the defense team is simply

_____

[28] Rec. Doc. 1-1, p. 23 (emphasis added).  The person referenced in paragraph 18, Donald Price, is another individual petitioner was convicted of murdering in an unrelated proceeding.  <u>See</u> <u>State v. Higgins</u>, 898 So.2d 1219 (La. 2005).

[29] A copy of that statement is attached to petitioner's federal application at Rec. Doc. 1-3, pp. 18-19.

unworthy of belief.  Accordingly, the state court did not err in failing to grant relief based on Jenkins' subsequent statement.

Petitioner also argues that counsel should have interviewed and called to testify experts witnesses in the fields of crime scene analysis, mental health, and DNA testing.  However, as the United States Fifth Circuit Court of Appeals recently reiterated:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.  This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted).  Petitioner clearly has not met his burden with respect to the proposed expert witnesses, in that he has not even identified any experts who would have expressed an opinion beneficial to the defense.

Petitioner also lists various other respects in which his trial counsel was allegedly ineffective.  He contends that counsel "failed to object to impermissible testimony presented by the State or the constitutionally defective grand jury indictment in this case."[30]  He further contends:

> Mr. Higgins attorney was also ineffective for failing to request a competency hearing in spite of the fact that Mr. Higgins had been previously found incompetent to stand trial, failing to provide Mr.

---

[30] Rec. Doc. 1, p. 30.

Higgins with accurate advise [sic] concerning matters in which Mr. Higgins' prerogative should have prevailed including the fact that Mr. Regan would not permit Mr. Higgins to testify, failing to adequate [sic] raise and litigate pretrial evidentiary and discovery issues, for failing to quash the venires, which had been comprised in a way that suppressed minority jury participation, and for failing to insure that the jury instructions adequately guided the jury, and for failing to file a motion for new trial.[31]

It is unclear whether petitioner is in fact advancing these allegations as separate bases for relief. In this proceeding, petitioner's counsel acknowledges that these are "nominal issues that were only summarily addressed" in the state court application.[32] In fact, the state courts rejected these claims as procedurally defaulted because they failed to state a factual basis for relief.[33] However, even if petitioner is advancing these issues as bases for relief, and even if the claims were not procedurally barred based on the state default,[34] the claims nevertheless still fail because, as in

---

[31] Rec. Doc. 1, p. 34.

[32] Rec. Doc. 16, p. 21.

[33] State Rec., Vol. III of XII, Order dated September 12, 2007, p. 5.

[34] Based on the state court ruling, it appears that the claims may be procedurally barred. As the United States Fifth Circuit Court of Appeals has explained:

A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision. To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted). If the state court relied on

state court, petitioner makes no attempt to explain or support this laundry list of allegations.  For

example, he has not identified the "impermissible testimony" to which counsel should have objected,

explained in what respect the indictment was defective, presented any evidence to indicate that

petitioner was in fact incompetent to stand trial, presented any evidence to show that petitioner in

fact wanted to testify or that Regan refused to permit it, presented any evidence to show that any

valid and prejudicial pretrial evidentiary or discovery issues existed, shown that there was valid

ground for having the venires quashed, explained in what respect the jury instructions were

defective, or identified a valid basis for a new trial.  Therefore, he has made no attempt whatsoever

to meet *his* burden of proof to demonstrate deficient performance *and* resulting prejudice.  Simply

put, petitioner's allegations are wholly conclusory, and it is clear that such "conclusory allegations

of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas

proceeding."  Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000); see also Baxter v. Quarterman,

270 Fed. App'x 313, 314 (5th Cir. 2008); Orange v. Cain, Civ. Action No. 06-10761, 2009 WL

938909, at *20 (E.D. La. Apr. 6, 2009).[35]

---

an independent and adequate state procedural rule, "federal *habeas* review is barred unless the
petitioner demonstrates either cause and prejudice or that a failure to address the claim will result
in a fundamental miscarriage of justice."  Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999).

       However, where, as here, claims clearly would not warrant relief even if considered,
a federal court may simply deny the claims on that basis without determining whether the claims are
procedurally barred.  Glover v. Hargett, 56 F.3d 682, 684 (5th Cir. 1995); Wiley v. Puckett, 969 F.2d
86, 104 (5th Cir. 1992); Corzo v. Murphy, Civ. Action No. 07-7409, 2008 WL 3347394, at *1 n.5
(E.D. La. July 30, 2008); Lee v. Cain, Civ. Action No. 06-9669, 2007 WL 2751210, at *9 (E.D. La.
Sept. 18, 2007).

    [35] Additionally, in any event, these various complaints largely concern discretionary matters of
trial tactics and strategies.  See, e.g., United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985)
("The decision whether to put a Defendant on the stand is a 'judgment call' which should not easily

As to petitioner's claim that his appellate counsel was ineffective, the state district court likewise denied that claim, holding:

> The petitioner complains that his attorney on his direct appeal was ineffective because he did not brief winning issues. He asserts that had the district court record been adequately reviewed, many compelling appellate issues would have been raised and the petitioner's conviction set aside.
>
> To address this serious challenge to the constitutionality of his conviction, the correct standard of law must be applied. Under Strickland, the reviewing court must apply a "heavy measure of deference to counsel's judgment." 466 U.S. at 691, 104 S.Ct. at 2066. A fair assessment requires the [sic] every effort be made to eliminate the distorting effects of hindsight. 466 at 689, 104 S.Ct. 2065.
>
> The petitioner also complains that his appellate attorney did not designate that the proceedings from every court appearance were to be transcribed. In particular, he argues that voir dire proceedings

_____

be condemned with the benefit of hindsight."); Rios-Delgado v. United States, 117 F.Supp.2d 581, 589 (W.D. Tex. 2000) ("Generally speaking, a failure to object, standing alone, does not rise to the level of constitutionally deficient performance. In cases where an accused complains that counsel was ineffective because he did not object to something ..., the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy."). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters of trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. In fact, regarding such matters of trial strategy, the United States Fifth Circuit Court of Appeals has noted:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are *virtually unchallengeable*. Moreover, a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it *permeates the entire trial with obvious unfairness.*

St. Aubin v. Quarterman, 470 F.3d 1096, 1102 (5th Cir. 2006) (internal quotation marks, brackets, and citations omitted) (emphasis added).

should have been transcribed for review by the appellate court.  To this claim, the state responds that the petitioner has not met his burden of proof under Strickland and that he has failed to state the factual basis of his claim with reasonable particularity.

In State v. Guillory, 670 So.2d 301, 95-383 (La. App. 3 Cir. 1/31/96), the defendant raised this same argument, that appellate counsel should have ordered a transcription of voir dire proceedings. Nonetheless, the Court of Appeal denied relief, as follows:

> However, he alleges no specific error during voir dire. Absent such alleged error, appellate counsel could not have ordered the voir dire transcript.  La. Code Crim. P. art. 914.1(B).  Furthermore, it has been held that defendants appealing as paupers who request free transcripts must show a particularized need.  State ex rel. Joseph v. State, 482 So.2d 680 (La. App. 1 Cir. 1985).  Defendant alleged no error nor did he show particularized need.  Accordingly, counsel did not act inappropriately in failing to order voir dire transcripts.

The petitioner specifically directs the court's attention to the minute entry of February 22, 2000.  This minute entry of voir dire proceedings notes that two Batson objections were made.  The fact that counsel made an unsuccessful Batson objection cannot meet the petitioner's burden for reversing his conviction.  More than the invocation of the word "Batson" is required before a peremptory challenge of the state is denied and certainly before a conviction is set aside.  The trial judge did not agree with defense counsel that Batson had been violated.

In support of his argument that counsel was ineffective for not raising a Batson claim on appeal, the petitioner cites Eagle v. Linahan, 268 F.3d 1306 (11th Cir. 2001).  This opinion has been corrected and superseded at 279 F.3d 926.  In the corrected opinion, the Eleventh Circuit found ineffective assistance of appellate counsel due to failure to raise a Batson objection.  Of critical importance was the fact that the trial judge denied the Batson claim under an incorrect legal standard.  In other words, had the claim been raised on appeal, the results of the proceedings would have been different.  In contrast to the facts of Eagle, in this case the trial judge did not make an erroneous statement of law in denying the Batson objections.

In general terms, the petitioner complains of other omissions of appellate counsel.  He argues that thirteen hearing dates should

have been transcribed. This claim fails to meet the necessary standard.

The Constitution of the State of Louisiana provides that "[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon *a complete record of all evidence upon which the judgment is based*." La. Const. Art. I, § 19. Additionally, in felony cases, a recording is required of [sic] under the provisions of LSA-C.Cr.P. art. 843 of "all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

Appellate review of the evidentiary portions of the trial is constitutionally sufficient. State v. Francis, 345 So.2d 1120, 1125 (La. 1/24/77), cert. denied, 434 U.S. 891, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). For these reasons, relief on this subclaim will be denied.[36]

Petitioner's related writ applications challenging that order were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[37] and by the Louisiana Supreme Court on January 30, 2009.[38]

On direct appeal, appellate counsel assigned a single error, i.e. that the photographic lineup was unduly suggestive.[39] However, in his federal application, petitioner alleges: "Had the [state district court] record been adequately reviewed and briefed, many other compelling issues

---

[36] State Rec., Vol. III of XII, Order dated September 12, 2007, pp. 6-7.

[37] Higgins v. Cain, No. 07-KH-811 (La. App. 5th Cir. Dec. 12, 2007) (unpublished); State Rec., Vol. III of XII.

[38] State ex rel. Higgins v. Cain, 999 So.2d 741 (La. 2009) (No. 2008-KP-0052); State Rec., Vol. XI of XII.

[39] State Rec., Vol. X of XII, Appellant's Brief.

would have been raised entitling Mr. Higgins to relief from this conviction."[40]  In assessing that

assertion, this Court must remember:

> Counsel is not deficient for not raising every non-frivolous
> issue on appeal.  Instead, to be deficient, the decision not to raise an
> issue must fall below an objective standard of reasonableness.  This
> reasonableness standard requires counsel to research relevant facts
> and law, or make an informed decision that certain avenues will not
> prove fruitful.  Solid, meritorious arguments based on directly
> controlling precedent should be discovered and brought to the court's
> attention.  Thus, to determine whether [a petitioner's] appellate
> counsel was deficient, [a federal court must] consider whether [the
> proposed claim] would have been sufficiently meritorious such that
> [petitioner's] counsel should have raised it on appeal.

United States v. Phillips, 210 F.3d 345, 348 (5th Cir. 2000) (citations and quotation marks omitted).

Despite petitioner's vague reference to "many other compelling issues" which should

have been raised on appeal, he expressly identifies in this claim only one such issue:  a Batson claim.

For the following reasons, this Court agrees that the trial court erred in its handling of petitioner's

Batson challenge and, therefore, a Batson claim was "sufficiently meritorious" that it should have

been raised on appeal.

The United States Supreme Court has explained:

> A defendant's Batson challenge to a peremptory strike
> requires a three-step inquiry.  First, the trial court must determine
> whether the defendant has made a prima facie showing that the
> prosecutor exercised a peremptory challenge on the basis of race.
> Second, if the showing is made, the burden shifts to the prosecutor to
> present a race-neutral explanation for striking the juror in question.
> Although the prosecutor must present a comprehensible reason, the
> second step of this process does not demand an explanation that is
> persuasive, or even plausible; so long as the reason is not inherently

---

[40] Rec. Doc. 1, p. 13.

> discriminatory, it suffices.  Third, the court must then determine
> whether the defendant has carried his burden of proving purposeful
> discrimination. This final step involves evaluating the persuasiveness
> of the justification proffered by the prosecutor, but the ultimate
> burden of persuasion regarding racial motivation rests with, and
> never shifts from, the opponent of the strike.

Rice v. Collins, 546 U.S. 333, 338 (2006) (citations, quotation marks, and brackets omitted).  In the

instant case, the trial court failed to do a complete Batson analysis.

Defense counsel first raised a Batson challenge at the conclusion of the first panel's

voir dire.  With respect to that panel, the prosecutor used peremptory strikes to remove one white

juror (George Scheuermann) and three black jurors (Thilisia Cooper, Marques Walton, and Terry

Sharpe).  The prosecutor also successfully challenged one black juror for cause, and the remaining

black person on the panel (Arthur Jones) was not challenged.  The trial court rejected the Batson

challenge, finding that petitioner failed to make a prima facie case of discrimination.[41]

Defense counsel thereafter reurged the Batson challenge at the conclusion of the

second panel's voir dire.  With respect to that panel, the prosecutor used peremptory strikes to

remove two white jurors (Susan Pieno and Corinne Neyrey) and two black jurors (Dianne Hobson

and Jeffery Penn).  The prosecutor did not challenge the remaining black juror (Paulette Stern);

however, defense counsel used a peremptory strike to remove her.  When defense counsel reurged

his Batson challenge, the prosecutor immediately proffered explanations for the last two strikes[42]

before the trial judge had an opportunity to rule on whether petitioner had now made a prima facie

------

[41] Rec. Doc. 16-3, pp. 132-35.

[42] The prosecutor did not offer any explanations for striking Thilisia Cooper, Marques Walton, and Terry Sharpe from the first panel.

case of discrimination.  The prosecutor explained that he struck Dianne Hobson because she stated that she knew the defendant's family and because she was "visibly shaking" during defense counsel's questioning.  The prosecutor stated that he struck Jeffery Penn because he was "aloof, unengaging" and "didn't appear to pay attention to anything"; the prosecutor explained "I just wasn't comfortable that he had an interest in being here."  The trial court stated that the prosecutor had "articulated race neutral reasons" for the peremptory challenges of Hobson and Penn; however, the court then ended the inquiry without expressly proceeding to third step of the analysis to evaluate the persuasiveness of those reasons.[43]

In light of the foregoing, the trial court's handling of the <u>Batson</u> challenge was problematic in at least two respects.

First, when defense counsel reurged his <u>Batson</u> challenge during the second panel, the trial judge did not rule on whether a prima facie case of discrimination had been established in light of the additional strikes.  However, because the prosecutor voluntarily proffered his reasons for striking Hobson and Penn, that was arguably unnecessary.  When a prosecutor voluntarily tenders race-neutral explanations for his strikes, the question of whether the defendant has made a prima facie case is moot, and the court proceeds directly to step two of the <u>Batson</u> analysis.  <u>Ladd v. Cockrell</u>, 311 F.3d 349, 355 (5th Cir. 2002);  <u>see also United States v. Williams</u>, 610 F.3d 271, 280 (5th Cir. 2010) ("Where, as here, the prosecutor tenders a race-neutral explanation for his peremptory strikes, the question of Defendant's prima facie case is rendered moot and our review is limited to the second and third steps of the <u>Batson</u> analysis.");  <u>State v. Bridgewater</u>, 823 So.2d

---

[43] Rec. Doc. 16-4, pp. 117-22.

877, 896-97 (La. 2002).  That said, the prosecutor offered explanations concerning only the strikes of Hobson and Penn.  Therefore, the trial court should have either again determined whether a prima facie case had now been established or, in light of the prosecutor's voluntary proffer, also required explanations for the earlier strikes of Cooper, Walton, and Sharpe from the first panel.

Second, because the prosecutor clearly proffered his reasons for striking Hobson and Penn, the trial court should have proceeded to the third step of the analysis as to those individuals. As noted, in the instant case, the trial judge did nothing more than observe that the prosecutor had *articulated* race neutral reasons for those strikes; the judge made no finding whatsoever concerning the *legitimacy* of those articulated reasons.  That is insufficient.  A determination that a prosecutor has articulated, or expressed, race-neutral reasons completes only step *two* of the *three*-step analysis. As the United States Third Circuit Court of Appeal recently noted:  "[A] <u>Batson</u> challenge is not defeated merely because the prosecutor purports to offer a race-neutral reason for striking the juror. Rather, the rule in <u>Batson</u> requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."  <u>Coombs v. Diguglielmo</u>, 616 F.3d 255, 261 (3rd Cir. 2010) (quotation marks and ellipsis omitted).  The Third Circuit continued:

> <u>Batson</u> requires an appropriately tailored inquiry, an opportunity for opposing counsel to argue that the proffered reasons are pretextual, and a finding by the trial court. If it were otherwise – and an unexamined explanation were allowed to survive a <u>Batson</u> challenge, <u>Batson</u> inquiries would quickly be reduced to a meaningless procedural ritual.

<u>Id</u>. at 264; <u>see also</u> <u>Green v. LaMarque</u>, 532 F.3d 1028, 1030 (9th Cir. 2008) ("When conducting the analysis at the third step, the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the

prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination.").

This Court recognizes that "a judge considering a <u>Batson</u> challenge is not required to comment explicitly on every piece of evidence in the record.  However, *some* engagement with the evidence considered is necessary as part of step three of the <u>Batson</u> inquiry, and this requires something more than a terse, abrupt comment that the prosecutor has satisfied <u>Batson</u>." <u>Hardcastle v. Horn</u>, 368 F.3d 246, 259 (3rd Cir. 2004) (citation and quotation marks omitted).  In the instant case, the trial court failed to provide even a "terse, abrupt comment" assessing the plausibility of the prosecutor's stated reasons; here, the judge offered no comment whatsoever on that issue.  A complete failure to rule on the plausibility of the prosecutor's stated reasons simply cannot be squared with the trial court's duty under the third step of <u>Batson</u>.

Based on the foregoing, this Court finds that the trial court erred in handling the <u>Batson</u> challenges and, therefore, appellate counsel performed deficiently in failing to raise a <u>Batson</u> claim on appeal.  The Court likewise finds that prejudice resulted, because there is a reasonable probability that petitioner would have prevailed on appeal if such a claim had been raised.  Accordingly, the Court finds that the state court's decision rejecting petitioner's claim that his appellate counsel was ineffective for failing to raise a <u>Batson</u> claim was an unreasonable application of <u>Strickland</u> and that federal *habeas corpus* relief is therefore warranted with respect to this claim.

However, out of an abundance of caution, the Court lastly notes that little consideration need be given to petitioner's remaining assertion that "other compelling issues" should also have been raised on appeal.  As noted, with respect to his <u>Strickland</u> claim, petitioner does not

even hint as to what those other issues might be, and his conclusory assertion is nothing short of

rank speculation.   Accordingly, he has not met his burden of proof to establish that his appellate

counsel performed deficiently in failing to raise those issues, whatever they might be, or that any

prejudice whatsoever resulted from that failure.[44]

### B.  Jury Misconduct

Petitioner also claims that the jury engaged in prejudicial misconduct.   Specifically,

he alleges that some of the jurors engaged in pre-deliberation discussions concerning the credibility

of a defense witness, with one juror referring to the witness "in a racially derisive manner as a

'hoochie mama.'"[45]   The state district court denied that claim, holding:

> The petitioner complains of jury misconduct, specifically that
> a juror made a comment on the credibility of a witness before
> deliberations began and without all jurors being present.   The
> comment in question is the alleged remark by one juror to another
> that a certain state witness was a "hoochie mama."
> Inquiry into the validity of a verdict is expressly prohibited by
> the jury shield law, LSA-C.E. art. 606(B).   This statute provides:

---

[44] The Court notes that petitioner's counsel did identify other possible appellate issues in support of his claim brought pursuant to United States v. Cronic, 466 U.S. 648 (1984).  Rec. Doc. 1, pp. 28-29.  However, that separate Cronic claim has since been voluntarily withdrawn.  Rec. Docs. 27 and 28.  Nevertheless, even if the Court were to consider those same potential issues with respect to the Strickland claim, the claim fares no better.  Once again, petitioner's counsel has provided nothing more than a laundry list of possible issues with no effort to provide the Court with a substantive discussion of whether the omission of the possible issues (1) amounted to deficient performance in the constitutional sense and (2) resulted in the prejudice required to support a Sixth Amendment claim.  That sort of conclusory, unsupported "advocacy" is neither appropriate nor sufficient to meet the burden which a petitioner clearly bears with respect to ineffective assistance claims.  Simply put, the Court cannot address arguments which are not properly made.

[45] Rec. Doc. 1, p. 35.

B.  Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, **a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith**, except a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention.  Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

LSA-C.E. art. 606(B), emphasis added.

Pre-deliberation comments between jurors have been held to violate the judge's instructions, but not to constitute an impermissible outside influence.  State v. Weaver, 917 So.2d 600, 612, 05-169 (La. App. 5 Cir. 11/29/05), writ denied, 944 So.2d 1277, 2006-0695 (La. 12/15/06).  Based on Weaver and the cases cited therein, as well as the express language of the jury shield law itself, this court will deny relief.

As held by the Fifth Circuit Court of Appeal, this statutory bar against inquiring into jury proceedings serves the important function of maintaining both the confidentiality and finality of jury verdicts and of the confidentiality of the jurors' deliberations.  State v. Videau, 04-923 (La. App. 5 Cir. 3/1/05), 900 S.2d 855, 863.

Notably, even on the merits the claim is unpersuasive.  In support of his contention that he was prejudiced, the petitioner relies on the Urban Dictionary, an internet site, located at urbandictionary.com.  The Urban Dictionary itself states that it defines contemporary slang "whose terms and definitions are solely user-generated and user-rated."  The site allows its "users to create definitions for slang words and phrases and submit them for publication."  It is estimated in court opinion that 37 percent of Urban Dictionary's users are from overseas.  American Civil Liberties Union v. Gonzales, 478 F.Supp.2d 775 (E.D. Pa. 2007).

The Court finds that the <u>Urban Dictionary</u> is completely lacking in credentials. This user-generated website lacks any value as persuasive authority. On the other hand, Merriamwebster.com, a web based site of a legitimate, authorized dictionary, defines "hoochie" as a slang word "a sexually promiscuous young woman." With this definition in mind, the court concludes that the petitioner's contention that the term "appears to implicate" the race of the witness is unfounded.

Moreover, even assuming the alleged comment was made by one juror and heard by another, nothing in this comment deprived the petitioner of a fair trial. Additionally, nothing in the comment addressed the credibility or truthfulness of the witness.

Both factually and legally, this claim of jury misconduct comes far short of meeting the petitioner's necessary burden of proof. Based on the inadequate showing made in connection with this claim, there is no basis for post-conviction relief and relief will be denied.[46]

Without additional reasons assigned, petitioner's related writ applications challenging that order were likewise denied by the Louisiana Fifth Circuit Court of Appeal on December 7, 2007,[47] and by the Louisiana Supreme Court on January 30, 2009.[48]

As correctly noted by the state court, Louisiana Code of Evidence Article 606(B), like the analogous federal rule on which it was modeled,[49] generally allows such post-verdict jury inquiries in only two instances: (1) when an outside influence was improperly brought to bear upon

---

[46] State Rec., Vol. III of XII, Order dated September 12, 2007, pp. 7-8.

[47] <u>Higgins v. Cain</u>, No. 07-KH-811 (La. App. 5th Cir. Dec. 12, 2007) (unpublished); State Rec., Vol. III of XII.

[48] State <i>ex rel.</i> <u>Higgins v. Cain</u>, 999 So.2d 741 (La. 2009) (No. 2008-KP-0052); State Rec., Vol. XI of XII.

[49] <u>See</u> La.Code Evid. art. 606, Comment (b) ("Paragraph B of this Article follows Federal Rule of Evidence 606(b) with respect to criminal cases."); <u>State v. Hailey</u>, 953 So.2d 979, 984 (La. App. 2nd Cir. 2007) ("This article is closely related, at least in criminal cases, to Federal Rule of Evidence 606.").

a juror or (2) when extraneous prejudicial information was improperly brought to the jury's

attention.  The reason for the law's distinction is that respect is evident:

> [T]here is a clear doctrinal distinction between evidence of improper *intra*-jury communications and *extra*-jury influences.   It is well-established that the latter pose a far more serious threat to the defendant's right to be tried by an impartial jury.  It has long been recognized that when jurors are influenced by the media and other publicity, or when they engage in communications with third parties, these extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process.  In contrast, when there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.

United States v. Resko, 3 F.3d 684, 690 (3rd Cir. 1993) (citations omitted).

Moreover, the reasons for the general prohibition are obvious:  "Courts properly

avoid such explorations into the jury's sovereign space, and for good reason.   The jury's

deliberations are secret and not subject to outside examination."  Yeager v. United States, 129 S.Ct.

2360, 2368 (2009) (citations omitted).  Although this prohibition may at times lead to seemingly

unjust results, the United States Tenth Circuit Court of Appeals explained the prohibition's greater

purposes in its discussion of the analogous federal rule:

> The rule against impeachment of a jury verdict by juror testimony as to internal deliberations may be traced back to "Mansfield's Rule," originating in the 1785 case of Vaise v. Delaval, 99 Eng. Rep. 944 (K.B. 1785).  Faced with juror testimony that the jury had reached its verdict by drawing lots, Lord Mansfield established a blanket ban on jurors testifying against their own verdict.  The rule was adopted by most American jurisdictions and "[b]y the beginning of [the twentieth] century, if not earlier, the near-universal and firmly established common-law rule in the United

States flatly prohibited the admission of juror testimony to impeach a jury verdict." Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). This common-law principle, together with exceptions also developed by common law, was eventually codified into Federal Rule of Evidence 606(b).

Rule 606(b) is a rule of evidence, but its role in the criminal justice process is substantive: it insulates the deliberations of the jury from subsequent second-guessing by the judiciary. Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review. Judges instruct the jury as to the law, but have no way of knowing whether the jurors follow those instructions. Judges and lawyers speak to the jury about how to evaluate the evidence, but cannot tell how the jurors decide among conflicting testimony or facts. Juries are told to put aside their prejudices and preconceptions, but no one knows whether they do so. Juries provide no reasons, only verdicts.

To treat the jury as a black box may seem to offend the search for perfect justice. The rule makes it difficult and in some cases impossible to ensure that jury verdicts are based on evidence and law rather than bias or caprice. But our legal system is grounded on the conviction, borne out by experience, that decisions by ordinary citizens are likely, over time and in the great majority of cases, to approximate justice more closely than more transparently law-bound decisions by professional jurists. Indeed, it might even be that the jury's ability to be irrational, as when it refuses to apply a law against a defendant who has in fact violated it, is one of its strengths. See John D. Jackson, Making Juries Accountable, 50 Am. J. Comp. L. 477, 515 (2002).

If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury, as the Constitution commands. Final authority would be exercised by whomever is empowered to decide whether the jury's decision was reasonable enough, or based on proper considerations. Judicial review of internal jury deliberations would have the result that "every jury verdict would either become the court's verdict or would be permitted to stand only by the court's leave." Carson v. Polley, 689 F.2d 562, 581 (5th Cir. 1982).

Defendants undoubtedly have a powerful interest in ensuring that the jury carefully and impartially considers the evidence. This

case presents that interest to the highest degree.  But there are compelling interests for prohibiting testimony about what goes on in the jury room after a verdict has been rendered.  The rule protects the finality of verdicts.  It protects jurors from harassment by counsel seeking to nullify a verdict.  It reduces the incentive for jury tampering.  It promotes free and frank jury discussions that would be chilled if threatened by the prospect of later being called to the stand.  Finally, it preserves the "community's trust in a system that relies on the decisions of laypeople [that] would all be undermined by a barrage of postverdict scrutiny."  Tanner, 483 U.S. at 121, 107 S.Ct. 2739; see also Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1548 (10th Cir. 1993) ("[T]he rule against jurors impeaching their own verdict is designed to promote the jury's freedom of deliberation, the stability and finality of verdicts, and the protection of jurors against annoyance and embarrassment."); Gov't of the V.I. v. Gereau, 523 F.2d 140, 148 (3d Cir. 1975) (listing these five policies behind the rule).

Like other rules of evidence protecting the confidentiality of certain communications, such as the attorney-client privilege or the priest-penitent privilege, Rule 606(b) denies the court access to what may be relevant information – information that might, for example, justify a motion for a new trial.  But like these other privileges, the rule protects the deliberative process in a broader sense.  It is essential that jurors express themselves candidly and vigorously as they discuss the evidence presented in court.  The prospect that their words could be subjected to judicial critique and public cross examination would surely give jurors pause before they speak.  See Tanner, 483 U.S. at 120, 107 S.Ct. 2739 ("If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.") (quoting McDonald v. Pless, 238 U.S. at 267-68, 35 S.Ct. 783).  Moreover, part of the urgency that comes from knowing that their decision is the final word may be lost if jurors know that their reasoning is subject to judicial oversight and correction.

United States v. Benally, 546 F.3d 1230, 1233-34 (10th Cir. 2008).

Similarly, the United States Supreme Court has noted:

There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of

> verdicts reached after irresponsible or improper juror behavior.  It is
> not at all clear, however, that the jury system could survive such
> efforts to perfect it.  Allegations of juror misconduct, incompetency,
> or inattentiveness, raised for the first time days, weeks, or months
> after the verdict, seriously disrupt the finality of the process.
> Moreover, full and frank discussion in the jury room, jurors'
> willingness to return an unpopular verdict, and the community's trust
> in a system that relies on the decisions of laypeople would all be
> undermined by a barrage of postverdict scrutiny of juror conduct.

Tanner v. United States, 483 U.S. 107, 120-21 (1987) (citations omitted).

Petitioner's claim, of course, is based on conversations which allegedly occurred

*prior* to the actual deliberations.  However, that distinction is of no moment.  As noted by the state

court, Article 606(B) has been interpreted also to encompass such pre-deliberation matters.  State

v. Weaver, 917 So.2d 600, 612-14 (La. App. 5th Cir. 2005).[50]

Accordingly, petitioner's evidence in support of his claim was admissible only if the

alleged impropriety fell within one of the stated exceptions to the general prohibition, i.e. if it

involved (1) an outside influence improperly brought to bear upon a juror or (2) extraneous

prejudicial information improperly brought to the jury's attention.  Here, however, there was no

allegation whatsoever of an improper "outside influence" or "extraneous prejudicial information."

In light of the foregoing, the state court correctly determined that, pursuant to

Louisiana Code of Evidence Article 606(B), petitioner's evidence in support of this claim was

inadmissible and his claim was not cognizable.  Additionally, and even more importantly, Louisiana

Code of Evidence Article 606(B) and its application by the state court was neither contrary to nor

---

[50] The same is true of the article's federal counterpart.  See, e.g., United States v. Cuthel, 903
F.2d 1381, 1383 (11th Cir. 1990).

an unreasonable application of clearly established *federal* law as required for *habeas* relief. Accordingly, petitioner's claim of jury misconduct should be denied.  See Salazar v. Dretke, 419 F.3d 384, 399 and 403-05 (5th Cir. 2005) (rejecting federal *habeas* claim challenging state court's application of the similar Texas rule disallowing post-verdict inquiries of jury misconduct); Higgins v. Cain, Civ. Action No. 09-2623, 2010 WL 890998, at *14 (E.D. La. Mar. 8, 2010).

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition of **Shawn Higgins** for federal *habeas corpus* relief be **CONDITIONALLY GRANTED IN PART**.

**IT IS FURTHER RECOMMENDED** that the petition be **GRANTED** with respect to his claim that his appellate counsel was ineffective for failing to raise a Batson claim and that petitioner be released from custody **with respect to this conviction**[51] unless the State of Louisiana initiates the appropriate proceedings in state court within 120 days from the date a final Judgment is entered in this matter.[52]

---

[51] The recommendation has no effect on petitioner's continued incarceration on any other outstanding conviction(s).

[52] In its response, the state suggests that, if relief is granted, the appropriate remedy is to "remand the matter to the State intermediate appellate court for a new appeal wherein the assignment may be posed and fully considered, possibly resulting in the further remand of the proceedings to the State district court for further development of the record."  Rec. Doc. 34, p. 10.  However, a federal *habeas* court has no authority to "remand" the matter to the state courts.  As the United States Fifth Circuit Court of Appeals has explained:

> Although we recognize that many courts have used the expression, we note that a federal habeas court cannot "remand" a case to the state courts.  If the writ is granted, or even conditionally granted, the state, pursuant to available state procedures, may then take whatever action it deems necessary, including reinitiating state court proceedings.  Thus, although the case may ultimately find its way back to the state courts as a result of a federal habeas action, the

**IT IS FURTHER RECOMMENDED** that the petition be **DENIED** with respect to petitioner's remaining claims.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[53]

New Orleans, Louisiana, this first day of February, 2011.



**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

case is by no means "remanded" to the state courts.

Billiot v. Puckett, 135 F.3d 311, 316 n.5 (5th Cir. 1998); see also Magwood v. Smith, 791 F.2d 1438, 1450 (11th Cir. 1986) ("[A] federal district court or court of appeals has no appellate jurisdiction over a state criminal case and hence has no authority to 'remand' a case to the state courts. The federal habeas corpus statute provides a mechanism for collateral, not appellate review. A federal court, however, is authorized to grant a conditional writ of habeas corpus."). However, if the State of Louisiana chooses to grant petitioner a new, out-of-time appeal to address the Batson claim, that would appear to be an appropriate remedy with respect to this violation of petitioner's right to effective appellate counsel.  See Mapes v. Tate, 388 F.3d 187, 194 (6th Cir. 2004); Myers v. Cain, 76 F.3d 1330, 1339 (5th Cir. 1996); Matire v. Wainwright, 811 F.2d 1430, 1439 (11th Cir. 1987); Bridges v. Berghuis, Civ. Action No. 06-CV-10566, 2009 WL 2488098, at *7 (E.D. Mich. Aug. 13, 2009).

[53] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

– 35 –